Matthew J. Langley (SBN 342286)
matt@almeidalawgroup.com
**ALMEIDA LAW GROUP LLC**
849 W. Webster Avenue
Chicago, Illinois 60614
t: 773-554-9354

Sonjay C. Singh*
**SIRI & GLIMSTAD LLP**
400 East Pratt Street
8th Floor - #16946751
Baltimore, MD 21202
Tel: (772) 783-8436
ssingh@sirillp.com

**pro hac vice* forthcoming

*Attorneys for Plaintiffs and the Class*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MICHAEL NIGRO, RICHARD MAIA, KERI ABELL, HEIDI FENTON, and ERIKA GARCIA, *on behalf of themselves and all others similarly situated,*<br><br>Plaintiffs,<br><br>v.<br><br>SLEEPCARE LLC d/b/a DAYBREAK,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT** |

Plaintiffs Michael Nigro, Richard Maia, Keri Abell, Heidi Fenton and Erika Garcia ("Plaintiffs"), individually and on behalf of all similarly situated persons, allege the following against Sleepcare LLC d/b/a Daybreak ("Daybreak" or "Defendant") based upon personal knowledge with respect to themselves and on information and belief derived from, among other things, investigation by Plaintiffs' counsel and review of public documents, as to all other matters:

## INTRODUCTION

1. This class action lawsuit arises out of Daybreak's unlawful use of third-party tracking technologies by data brokers such as Alphabet, Inc. ("Google") and Meta Platforms, Inc. ("Facebook" and, together with Google, the "Tracking Tool Providers") to surreptitiously intercept and disclose its users' private and protected communications, including communications concerning highly sensitive personal health information, to third parties without users' knowledge or consent.

2. By purposely embedding and deploying third party tracking technologies on its website, available at www.thedaybreak.com (the "Website"), Daybreak engages in the unauthorized disclosure of its users' highly sensitive protected health information ("PHI") and personally identifiable information ("PII" and together with PHI, "Sensitive Health Information") to third parties including, but not limited to, Google and Facebook. Such disclosures of PHI and PII violate state and federal law.

3. Daybreak offers a sleep apnea treatment called the "Daybreak Device," which it describes as an "FDA-cleared device [that] fits like a retainer, and gently moves your lower jaw forward to open your airway to relieve both snoring and sleep apnea."[1] Daybreak's Website also indicates that "94% of people report less snoring and over 90% of people continue treatment at 2.5 years."[2]

//

//

---

[1] *Already Diagnosed?*, https://www.thedaybreak.com/already-diagnosed (last visited March 10, 2026).
[2] *Id.*

4. On its Website, Daybreak encourages users to complete an assessment (the "Sleep Apnea Assessment") to determine if Daybreak's sleep apnea treatment is appropriate for them.[3] The Sleep Apnea Assessment asks questions like "Have you ever been diagnosed with Sleep Apnea?" and "Do you ever stop breathing, gasp, or choke while sleeping?"[4] After completing the assessment, users are asked to submit their first and last name, email address, and phone number to create a profile.[5] Then, Website users can order Daybreak's at-home sleep test to determine what kind of treatment is most appropriate for their sleep apnea.

5. Unbeknownst to users who took Daybreak's Sleep Apnea Assessment on the Website, their communications were intercepted and disclosed to third parties through Daybreak's use of third-party tracking technologies (the "Tracking Tools"). These Tracking Tools track a user's activity on a website and send corresponding data to third parties, including Google and Facebook.

6. The information transmitted to unauthorized third parties by the Tracking Tools embedded on Daybreak's Website include: (i) that the user has been diagnosed with sleep apnea (ii) that the user has used a CPAP; (iii) that the user has undergone a sleep test in the past two years; (iv) the specific medical symptoms the user has experienced, such as disruptive snoring or daytime fatigue; (v) the diagnosis from the user's completed Sleep Apnea Assessment; (vi) the medical products and medical tests ordered through the Website by the user; and (vii) unique personal identifiers associated with the user. (collectively, the "Sensitive Health Information").

7. Health information is highly regulated by both state and federal law, including HIPAA, which imposes criminal penalties on disclosing individually identifiable health information ("IIHI") to a third party, including any information that "is created or received by a health care provider" and "relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of

---

[3] *Assessment,* https://www.thedaybreak.com/assessment (last visited March 10, 2026).
[4] *Id.*
[5] *Id.*

health care to an individual[.]”[6] Accordingly, Daybreak’s disclosure of Plaintiffs’ and Class Members’ Sensitive Health Information constitutes a violation of HIPAA.

8. Daybreak installed the Tracking Tools with the intent to collect and disclose users’ Sensitive Health Information for purposes of financial gain.

9. Plaintiffs and Class Members never consented to, authorized, or otherwise agreed to allow Daybreak to disclose their PHI and PII to anyone other than those reasonably believed to be part of Daybreak, acting in a healthcare-related capacity. Despite this, Daybreak knowingly and intentionally disclosed Plaintiffs’ and Class Members’ PHI and PII to Google, Facebook, and other third parties.

10. Online advertising giants, like the Tracking Tool Providers, compile as much information as possible about American consumers, including information relating to the most private aspects of their lives, as fuel for their massive, targeted advertising enterprise. Thus, any information about a person captured by those online behemoths can be used to stream ads to that person.

11. The Tracking Tool Providers offer website operators access to their proprietary suites of marketing, advertising, and customer analytics software, including Google Analytics, Google AdSense, Google Tag Manager, Meta Business Suite, and Facebook Ads (collectively, the “Business Tools”). Armed with these Business Tools, website operators can leverage The Tracking Tool Providers’ enormous database of consumer information for the purposes of deploying targeted advertisements, performing minute analyses of their customer bases, and identifying new market segments that may be exploited.

12. But, in exchange for access to these Business Tools, website operators install the Tracking Tool Providers’ surveillance software on their website (the “Tracking Tools”), including “tracking pixels” (“Pixels”) and third-party “cookies” that capture sensitive, personally identifiable information provided to the website operator by its website users. This sensitive information can include a unique identifier that The Tracking Tool Providers use to identify that user, regardless of

[6] 18 U.S.C. § 1320d-(6).

what computer or phone is used to access the website. The Tracking Tools can also capture and share other information like the specific webpages visited by a website user, items added to an online shopping cart by a website user, information entered into an online form by a website user, and the device characteristics of a website user's phone or computer.

13. In essence, when website operators use the Business Tools, they choose to participate in the Tracking Tool Providers' mass surveillance network and, in turn, benefit from the Tracking Tool Providers' collection of user data at the expense of their customers' privacy.

14. Defendant is one of the companies that has chosen to prioritize its profits over its patients' privacy by installing the Tracking Tools on its website.

15. Each of the Plaintiffs and Class Members used the Website and had their personal Sensitive Health Information tracked by Defendant using the Tracking Tools. However, Defendant ***never*** obtained authorization from Plaintiffs or Class Members to share their Sensitive Health Information with third parties. Therefore, at all relevant times, Plaintiffs and Class Members could not, and did not, provide informed consent for their Sensitive Health Information to be transmitted to the third parties, including to the largest advertiser and compiler of user information in the world.

16. Health information is highly regulated by both state and federal law, including the Health Insurance Portability and Accountability Act ("HIPAA"), which imposes criminal penalties on disclosing individually identifiable health information to a third party, including any information that "is created or received by a health care provider" and "relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual[.]"[7] Accordingly, Defendant's disclosure of Plaintiffs' and Class Members' Sensitive Health Information constitutes a violation of HIPAA.

17. As a result of Defendant's conduct, Plaintiffs and Class Members have suffered numerous injuries, including: (i) invasion of medical privacy; (ii) lack of trust in communicating with

[7] 18 U.S.C. § 1320d-(6).

medical providers; (iii) emotional distress and heightened concerns related to the release of Sensitive Health Information to third parties, (iv) loss of benefit of the bargain; (v) diminution of value of the Sensitive Health Information; (vi) statutory damages and (vii) continued and ongoing risk to their Sensitive Health Information.

18. Therefore, Plaintiffs seek, on behalf of themselves and a class of similarly situated persons, to remedy these harms and assert the following statutory and common law claims against Defendant: Invasion of Privacy; Negligence; Breach of Implied Contract; Unjust Enrichment; Breach of Fiduciary Duty; Breach of Confidence; and violations of the Electronic Communications Privacy Act ("ECPA").

## PARTIES

***Plaintiff Michael Nigro***

19. Plaintiff Michael Nigro is a citizen of the State of Arkansas, residing in Lawrence County, and brings this action both in an individual capacity, and on behalf of all others similarly situated.

20. In March 2022, Plaintiff Nigro visited his doctor because he was having trouble sleeping. Following an evaluation, his doctor diagnosed him with insomnia and sleep apnea. During this visit, Plaintiff Nigro's doctor also suggested several treatment options.

21. Following this visit, in or around March 2022, Plaintiff Nigro utilized his personal electronic devices to visit Daybreak's Website to investigate Daybreak's treatment options. He took the Sleep Apnea Assessment on the Website and received a result diagnosing him with sleep apnea. As a result, Daybreak recommended that Plaintiff Nigro try the Daybreak Device. Following his submission of the Sleep Apnea Assessment, he began receiving emails and text messages from Daybreak.

22. Unbeknownst to Plaintiff, the Website transmitted the Sensitive Health Information that he communicated while using the Website, including while taking the Sleep Apnea Assessment. Among the Sensitive Health Information that Plaintiff disclosed to Defendant, and which were disclosed to third parties including Google and Facebook, were: (1) that he had been diagnosed with

sleep apnea (2) that he had used a CPAP; (3) that he had undergone a sleep test in the past two years; (4) the specific sleep apnea symptoms that he experienced, such as disruptive snoring or daytime fatigue; (5) and the outcome of his completed Sleep Apnea Assessment diagnosing him with sleep apnea; and (6) that he added to his cart the Daybreak Device used to treat to his sleep apnea.

23. Defendant also disclosed to third parties Plaintiff's PII, including identifiers that tie his interactions on the Website to his Google and/or Facebook account.

24. Plaintiff never authorized Defendant to disclose any aspect of his communications with Defendant through the Website to third parties, including the Sensitive Health Information that he provided to Defendant.

25. On every occasion that he visited the Website, Plaintiff Nigro possessed an account with Google and Facebook, and he accessed the Website while logged into his Google and/or Facebook accounts on the same personal electronic device.

26. After providing his Sensitive Health Information to Defendant through the Website, Plaintiff Nigro began seeing targeted online advertisements for health services and products related to sleep apnea.

***Plaintiff Richard Maia***

27. Plaintiff Maia is a citizen of the State of Florida, residing in St. Johns County, and brings this action both in an individual capacity, and on behalf of all others similarly situated.

28. In 2025, Plaintiff Maia began exploring potential sleep apnea treatments after his wife noticed that he frequently stopped breathing while he was asleep. In or around October of 2025, Plaintiff Maia utilized his personal electronic devices to visit Daybreak's Website to investigate Daybreak's treatment options. He took the Sleep Apnea Assessment on the Website and received a diagnosis of sleep apnea. Plaintiff Maia purchased Daybreak's Sleep Test, which also diagnosed that he suffered from sleep apnea.

29. Unbeknownst to Plaintiff, the Website transmitted the Sensitive Health Information that he communicated while using the Website, including while taking the Sleep Apnea Assessment. Among the Sensitive Health Information that Plaintiff disclosed to Defendant, and which were

disclosed to third parties including Google and Facebook, were: (1) that he had been diagnosed with sleep apnea (2) that he had used a CPAP; (3) that he had undergone a sleep test in the past two years; (4) the specific sleep apnea symptoms that he experienced, such as disruptive snoring or daytime fatigue; (5) and the outcome of his completed Sleep Apnea Assessment diagnosing him with sleep apnea; and (6) that he added the Sleep Test to his cart.

30. Defendant also disclosed to third parties Plaintiff's PII, including identifiers that tie his interactions on the Website to his Google and/or Facebook account.

31. Plaintiff never authorized Defendant to disclose any aspect of his communications with Defendant through the Website to third parties, including the Sensitive Health Information that he provided to Defendant.

32. On every occasion that he visited the Website, Plaintiff Nigro possessed an account with Google and Facebook, and he accessed the Website while logged into his Google and/or Facebook accounts on the same personal electronic device.

33. After providing his Sensitive Health Information to Defendant through the Website, Plaintiff Nigro began seeing targeted online advertisements for health services and products related to sleep apnea.

***Plaintiff Keri Abell***

34. Plaintiff Keri Abell is a citizen of the State of Kansas, residing in Johnson County, and brings this action both in an individual capacity, and on behalf of all others similarly situated.

35. Plaintiff Abell was diagnosed with obstructive sleep apnea in or around 2019. To treat her condition, she initially used a CPAP.

36. In early 2025, Plaintiff Abell began researching different treatment options for her sleep apnea. She found and visited Daybreak's Website using her personal electronic devices in or around February 2025. She took the Sleep Apnea Assessment on the Website and then proceeded to order Daybreak's Sleep Test. After purchasing and taking Daybreak's Sleep Test, Plaintiff Abell purchased the Daybreak Device in or around March 2025.

37. Unbeknownst to Plaintiff Abell, the Website transmitted the Sensitive Health Information that she communicated while using the Website, including while taking the Sleep Apnea Assessment. Among the Sensitive Health Information that Plaintiff disclosed to Defendant, and which were disclosed to third parties including Google and Facebook, were: (1) that she had been diagnosed with sleep apnea (2) that she had used a CPAP; (3) that she had undergone a sleep test in the past two years; (4) the specific sleep apnea symptoms that she experienced, such as disruptive snoring and daytime fatigue; (5) and the outcome of her completed Sleep Apnea Assessment diagnosing her with sleep apnea; (6) that she purchased the Daybreak Sleep Test; and (7) that she purchased the Daybreak Device to treat her sleep apnea.

38. Defendant also disclosed to third parties Plaintiff's PII, including identifiers that tie her interactions on the Website to her Google and/or Facebook account.

39. Plaintiff never authorized Defendant to disclose any aspect of her communications with Defendant through the Website to third parties, including the Sensitive Health Information that she provided to Defendant.

40. On every occasion that she visited the Website, Plaintiff Abell possessed an account with Google and Facebook, and she accessed the Website while logged into her Google and/or Facebook accounts on the same personal electronic device.

41. After providing her Sensitive Health Information to Defendant through the Website, Plaintiff Abell began seeing targeted online advertisements for health services and products related to sleep apnea.

***Plaintiff Heidi Fenton***

42. Plaintiff Heidi Fenton is a citizen of the State of Pennsylvania, residing in Elk County, and brings this action both in an individual capacity, and on behalf of all others similarly situated.

43. Plaintiff Fenton was diagnosed with obstructive sleep apnea in or around 2022. To treat her condition, she initially used a CPAP machine but sought alternative options.

44. In 2025, Plaintiff Fenton began researching different treatment options for her sleep apnea. She found and visited Daybreak's Website using her personal electronic devices in or around

November of 2025, at which time she completed the Sleep Apnea Assessment on the Website and then ordered Daybreak's Sleep Test.

45. Unbeknownst to Plaintiff Fenton the Website transmitted the Sensitive Health Information that she communicated while using the Website, including while taking the Sleep Apnea Assessment. Among the Sensitive Health Information that Plaintiff disclosed to Defendant, and which were disclosed to third parties including Google and Facebook, were: (1) that she had been diagnosed with sleep apnea (2) that she had used a CPAP; (3) that she had undergone a sleep test in the past two years; (4) the specific sleep apnea symptoms that she experienced, such as disruptive snoring and daytime fatigue; (5) the outcome of her completed Sleep Apnea Assessment diagnosing her with sleep apnea; and (6) that she purchased the Daybreak Sleep Test.

46. Defendant also disclosed to third parties Plaintiff's PII, including identifiers that tie her interactions on the Website to her Google and/or Facebook account.

47. Plaintiff Fenton never authorized Defendant to disclose any aspect of her communications with Defendant through the Website to third parties, including the Sensitive Health Information that she provided to Defendant.

48. On every occasion that she visited the Website, Plaintiff Fenton possessed an account with Google and Facebook, and she accessed the Website while logged into her Google and Facebook accounts on the same personal electronic device.

49. After providing her Sensitive Health Information to Defendant through the Website, Plaintiff Fenton began seeing targeted online advertisements for health services and products related to sleep apnea.

***Plaintiff Evelyn Hernandez***

50. Plaintiff Hernandez is a citizen of the State of Florida, residing in Miami-Dade County, and brings this action both in an individual capacity, and on behalf of all others similarly situated.

51. Plaintiff Hernandez was diagnosed with obstructive sleep apnea in or around 2021. To treat her condition, she uses a CPAP machine, which she finds uncomfortable.

52. In 2025, Plaintiff Hernandez began researching different treatment options for her sleep apnea. She found and visited Daybreak's Website using her personal electronic devices in or around October of 2025, at which time she completed the Sleep Apnea Assessment on the Website and then ordered Daybreak's Sleep Test. After completing the Sleep Test, Plaintiff Hernandez ordered the Daybreak Device.

53. Unbeknownst to Plaintiff Hernandez, the Website transmitted the Sensitive Health Information that she communicated while using the Website, including while taking the Sleep Apnea Assessment. Among the Sensitive Health Information that Plaintiff disclosed to Defendant, and which were disclosed to third parties including Google and Facebook, were: (1) that she had been diagnosed with sleep apnea (2) that she had used a CPAP; (3) that she had undergone a sleep test in the past two years; (4) the specific sleep apnea symptoms that she experienced, such as disruptive snoring and daytime fatigue; (5) the outcome of her completed Sleep Apnea Assessment diagnosing her with sleep apnea; (6) that she purchased the Daybreak Sleep Test; and (7) that she purchased the Daybreak Device.

54. Defendant also disclosed to third parties Plaintiff's PII, including identifiers that tie her interactions on the Website to her Google and/or Facebook account.

55. Plaintiff Hernandez never authorized Defendant to disclose any aspect of her communications with Defendant through the Website to third parties, including the Sensitive Health Information that she provided to Defendant.

56. On every occasion that she visited the Website, Plaintiff Hernandez possessed an account with Google and Facebook, and she accessed the Website while logged into her Google and Facebook accounts on the same personal electronic device.

57. After providing her Sensitive Health Information to Defendant through the Website, Plaintiff Hernandez began seeing targeted online advertisements for health services and products related to sleep apnea.

***Defendant Sleepcare LLC d/b/a Daybreak***

58. Defendant Sleepcare LLC d/b/a Daybreak is a limited liability company incorporated in the State of Michigan, with its principal place of business at 2108 N St. Ste N Sacramento, CA in Sacramento County.

**JURISDICTION AND VENUE**

59. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 putative class members and minimal diversity exists because Plaintiffs and many putative class members are citizens of a different state than Defendant. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

60. This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this Complaint alleges question of federal laws under the ECPA (18 U.S.C. § 2511, et seq.).

61. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

62. This Court has personal jurisdiction over Defendant because Defendant is headquartered in Sacramento, California and conducts significant operations in this District.

63. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Defendant resides in this District. Defendant is a corporation with its principal place of business in Sacramento, California, and therefore resides in this judicial District for venue purposes under 28 U.S.C. § 1391(c)(2).

**FACTUAL ALLEGATIONS**

**A. DEFENDANT'S USE OF THIRD-PARTY TRACKING TOOLS**

**i. The Tracking Tool Providers' Mass Advertising Surveillance Operations**

64. Google is the largest digital advertiser in the country, accounting for 26.8-percent of the total digital advertising revenue generated in the United States.

[8] In 2023, Google's advertising revenue of $238 billion accounted for 77-percent of its total revenue for the year.[9]

65. Google advertises Google Analytics and other Business Tools to website operators, like Defendant, claiming they will allow the operator to "[u]nderstand [their] site and app users," "check the performance of [their] marketing," and "[g]et insights only Google can give."[10] But in order for website operators to get information from Google Analytics about their website's visitors, they must allow data collection through installation of Google's Tracking Tools on their website.[11]

66. Indeed, on its *Privacy & Terms* page, Google admits that it collects information from third-party websites, stating that "[m]any websites and apps use Google services to improve their content and keep it free. When they integrate our services, these sites and apps share information with Google."[12]

67. Google also admits that it uses the information collected from third-party websites, such as the Website, to sell targeted advertising, explaining to users that, "[f]or example, a website that sells mountain bikes might use Google's ad services. After you visit that site, you could see an ad for mountain bikes on a different site that shows ads served by Google."[13]

---

[8] *Share of major ad-selling companies in digital advertising revenue in the United States*, STATISTA (May 2024), https://www.statista.com/statistics/242549/digital-ad-market-share-of-major-ad-selling-companies-in-the-us-by-revenue/#:~:text=In%202023%2C%20Google%20accounted%20for,21.1%20and%2012.5%20percent%2C%20respectively (last visited Jan. 26, 2026).

[9] Florian Zandt, *Google's Ad Revenue Dwarfs Competitors*, STATISTA (Sep. 10, 2024), https://www.statista.com/chart/33017/annual-advertising-revenue-of-selected-tech-companies-offering-search-solutions/#:~:text=Online%20advertising&text=Alphabet%2C%20the%20company%20behind%20the,overall%20revenue%20this%20past%20year (last visited Jan. 26, 2026).

[10] *Welcome to Google Analytics*, GOOGLE, https://analytics.google.com/analytics/web/provision/?authuser=0#/provision (last visited Jan. 26, 2026).

[11] *See* Aaron Ankin & Surya Matta, *The High Privacy Cost of a "Free" Website*, THE MARKUP, https://themarkup.org/blacklight/2020/09/22/blacklight-tracking-advertisers-digital-privacy-sensitive-websites (last visited Jan. 26, 2026).

[12] *Privacy & Terms – How Google uses information from sites or apps that use our services*, GOOGLE, https://policies.google.com/technologies/partner-sites (last visited Jan. 26, 2026).

[13] *Id.*

68. Facebook operates the world's largest social media company and derives the vast majority of its revenue from selling advertisements. In the third quarter of 2025, Facebook reported a total revenue of $51.2 billion.[14] Of that amount, **$50.1 billion** (or approximately **98%** of the total) was attributable to ad revenue.[15]

69. Facebook markets its Business Tools to website operators, claiming that that its Business Tools can:

> [H]elp website owners and publishers, app developers, and business partners, including advertisers and others, integrate and share data with Meta, understand and measure their products and services, and better reach and serve people who use or might be interested in their products and services.[16]

70. But, like with Google, website operators using Facebook's Business Tools must install Facebook's Tracking Tools on their website. Facebook readily admits that it "receives information from [third-party] businesses and organizations," such as Defendant, and uses that information to sell targeted advertising.[17] By way of example, Facebook's online Help Center explains that users "may see [Facebook] ads for hotel deals if [they] visit travel websites."[18]

71. While the Tracking Tool Providers admit that they collect information from third-party websites through the Tracking Tools, none provide, nor could provide, a publicly available list of every webpage on which their Tracking Tools are installed. As such, the vague descriptions of the Tracking Tool Providers' data collection practices referenced above could not give Plaintiffs and Class Members any reason to think that Defendant was part of the Tracking Tool Providers' surveillance network. Moreover, as Defendant does not disclose its use of the Tracking Tools, Plaintiffs and Class Members

---

[14] *Meta Earnings Presentation Q3 2025*, META, available online at: https://s21.q4cdn.com/399680738/files/doc_financials/2025/q3/Earnings-Presentation-Q3-2025-Final.pdf (last visited March 10, 2026).

[15] *Id.*

[16] *The Meta Business Tools*, FACEBOOK HELP CENTER, https://www.facebook.com/help/331509497253087?helpref=faq_content (last accessed March 10, 2026).

[17] *How Meta receives information from other business and organizations*, FACEBOOK HELP CENTER, https://www.facebook.com/help/2230503797265156/?helpref=related_articles (last accessed March 10, 2026).

[18] *Id.*

could not have been reasonably expected to review any of the Tracking Tool Providers' privacy statements in connection with their use of the Website.

72. The Tracking Tool Providers aggregate the user information that they collect from third-party websites into 'advertising profiles' consisting of all of the data that they have collected about a given user.[19] With these advertising profiles, The Tracking Tool Providers can sell hyper-precise advertising services, allowing their clients to target internet users based on combinations of their location, age, race, interests, hobbies, life events (e.g., recent marriages, graduation, or relocation), political affiliation, education level, home ownership status, marital status, household income, type of employment, use of specific apps or websites, and more.[20]

73. The surveillance of individual's internet usage through Tracking Tools is ubiquitous. In 2017, Scientific American reported that over 70-percent of smartphone apps report "personal data to third-party tracking companies like Google[, and] Facebook[.]"[21] Google trackers are present on 74-percent of all web traffic, and 16-percent of websites have a hidden Facebook tracking Pixel.[22]

74. Moreover, as in this case, the data collected through the Tracking Tools often pertains to the most personal and sensitive aspects of an individual's life. For example:

---

[19] Bennett Cyphers & Gennie Gebhart, *Behind the One-Way Mirror: A Deep Dive Into the Technology of Corporate Surveillance*, ELECTRONIC FRONTIER FOUNDATION (2019), *available online at*: https://www.eff.org/files/2019/12/11/behind_the_one-way_mirror-a_deep_dive_into_the_technology_of_corporate_surveillance_0.pdf.

[20] *About audience segments*, GOOGLE ADS, https://support.google.com/google-ads/answer/2497941?hl=en#zippy=%2Cin-market-segments%2Caffinity-segments%2Clife-events%2Cdetailed-demographics (last accessed March 10, 2026); *Facebook Ads: Who You Can Target*, SEOM Interactive, https://searchenginesmarketer.com/company/resources/facebook-ads-can-target/ (last accessed March 10, 2026).

[21] Narseo Vallina-Rodriguez & Srikanth Sundaresan, *7 in 10 Smartphone Apps Share Your Data with Third-Party Services*, SCIENTIFIC AMERICAN (May 30, 2017), https://www.scientificamerican.com/article/7-in-10-smartphone-apps-share-your-data-with-third-party-services/ (last accessed March 10, 2026).

[22] *WhoTracksMe*, Ghostery, https://www.ghostery.com/whotracksme/ (last accessed Aug. 27, 2025).

a. 93-percent of pornography websites allow third parties, including Google and Facebook, to collect their user's browsing habits.[23] In fact, Google advertising trackers were found on 73-percent of pornography websites.[24]

b. 81-percent of the most popular mobile apps for managing depression and quitting smoking allowed Facebook and/or Google to access subscriber information, including health diary entries and self-reports about substance abuse.[25]

c. Twelve of the largest pharmacy providers in the United States send information regarding user's purchases of products such as pregnancy tests, HIV tests, prenatal vitamins, and Plan B to online advertisers.[26] For example, when an online shopper searches for a pregnancy test, views the product page for a pregnancy test, or adds a pregnancy test to their online shopping cart on Kroger's website, that information is transmitted to Google and Facebook.[27]

d. Thirty-three of the most popular crisis center websites provide information to Facebook through its Meta Pixel, including, in some cases, that users filled out a contact form or clicked a button to initiate a call to a suicide helpline.[28]

75. This monumental, invasive surveillance of Americans' internet usage is not accidental. As Google's then-CEO Eric Schmit admitted in 2010: "We know where you are. We know where

---

[23] Elena Maris, Timothy Libert & Jennifer R. Henrichsen, *Tracking sex: The implications of widespread sexual data leakage and tracking on porn websites*, NEW MEDIA & SOCIETY (2020), *available online at*: https://journals.sagepub.com/doi/10.1177/1461444820924632.
[24] *Id*.
[25] Kit Huckvale, John Torous & Mark E. Larsen, *Assessment of the Data Sharing and Privacy Practices of Smartphone Apps for Depression and Smoking Cessation*, JAMA NETWORK OPEN (2019), *available online at*: https://pubmed.ncbi.nlm.nih.gov/31002321/.
[26] Darius Tahir & Simon Fondrie-Teitler, *Need to Get Plan B or an HIV Test Online? Facebook May Know About It*, THE MARKUP (June 30, 2023), https://themarkup.org/pixel-hunt/2023/06/30/need-to-get-plan-b-or-an-hiv-test-online-facebook-may-know-about-it (last accessed March 10, 2026).
[27] Jon Keegan, *Forget Milk and Eggs: Supermarkets Are Having a Fire Sale on Data About You*, THE MARKUP (Feb. 16, 2023), https://themarkup.org/privacy/2023/02/16/forget-milk-and-eggs-supermarkets-are-having-a-fire-sale-on-data-about-you (last accessed March 10, 2026).
[28] Colin Lechner & Jon Keegan, *Suicide Hotlines Promise Anonymity. Dozens of Their Websites Send Sensitive Data to Facebook*, THE MARKUP (June 30, 2023), https://themarkup.org/pixel-hunt/2023/06/13/suicide-hotlines-promise-anonymity-dozens-of-their-websites-send-sensitive-data-to-facebook (last accessed March 10, 2026).

you've been. We can more or less know what you're thinking about."[29] Likewise, in 2008, Facebook CEO Mark Zuckerberg predicted that the amount of information shared by individuals online will likely double every year, and Facebook's best strategy is to be "pushing that forward."[30]

76. In fact, Google and Facebook value user information so highly that they provide their Business Tools to many website operators for free, all to expand their surveillance apparatus.[31]

77. When website operators, like Defendant, make use of the Tracking Tool Providers' Business Tools, they are essentially choosing to participate in the Tracking Tool Providers' mass surveillance network, and in return they benefit from the Tracking Tool Providers' collection of user data, at the expense of their website users' privacy. For example, in exchange for allowing it to collect user information, Facebook allows website operators to target customers with "dynamic advertisements" personalized to individual consumers using the user information that Facebook collects from all across the internet.[32] Likewise, Google rewards website operators for providing it with their user's information by granting access to its Analytics platform, which leverages demographic data collected by Google to provide detailed analyses of the website's user base.[33]

78. In many cases, a website operator's use of third-party tracking software is not disclosed whatsoever in its privacy policy.[34] Even where the use of such third-party software is disclosed, such

---

[29] Andrew Orlowski, *Google's Schmidt: We know what you're thinking*, THE REGISTER (Oct. 4, 2020), https://www.theregister.com/2010/10/04/google_ericisms/ (last accessed March 10, 2026).

[30] Michael Zimmer, *Mark Zuckerberg's Theory of Privacy,* THE WASHINGTON POST (Feb. 4, 2014), https://www.washingtonpost.com/lifestyle/style/mark-zuckerbergs-theory-of-privacy/2014/02/03/2c1d780a-8cea-11e3-95dd-36ff657a4dae_story.html (last accessed March 10, 2026

[31] *Analytics Overview*, GOOGLE, https://marketingplatform.google.com/about/analytics/ ((last accessed March 10, 2026) ("Google Analytics gives you the tools, free of charge"); *Meta Business Suite FAQ*, META, https://www.facebook.com/business/tools/meta-business-suite/help (last accessed March 10, 2026) ("Meta Business Suite is a free tool").

[32] *Retargeting*, META, https://www.facebook.com/business/goals/retargeting (last accessed March 10, 2026).

[33] *Google Marketing Platform – Features*, GOOGLE, https://marketingplatform.google.com/about/analytics/features/ (last accessed March 10, 2026).

[34] *See* Woodrow Hartzog, *Privacy's Blueprint*, 60-67 (Harvard University Press 2018) (detailing deficiencies with online privacy policies).

disclosures are often hidden and cloaked in such confusing, technical and overly legal language as to be indecipherable to the typical internet user.[35]

79. Moreover, for even a conscientious internet user, the massive volume of privacy policies encountered through routine internet use makes reviewing each and every one practically impossible. According to one study, it would take the average internet user 244 hours – or 30.5 working days – to read the privacy policy of every new website that they visited in a single year.[36]

**ii. Pixels Can Record Almost Every Interaction Between a User and a Website.**

80. In order to use Tracking Tool Providers' Business Tools, Defendant installed Tracking Tools, including tracking Pixels, onto the Website.

81. Pixels are one of the tools used by website operators to track user behavior. As the Federal Trade Commission ("FTC") explains, a Pixel is:

> [A] small piece of code that will be placed into the website or ad and define [the Pixel operator's] tracking goals such as purchases, clicks, or pageviews…
>
> Pixel tracking can be monetized in several ways. One way to monetize pixel tracking is for companies to use the tracking data collected to improve the company's own marketing campaigns…Another is that companies can monetize the data collected by further optimizing their own ad targeting systems and charging other companies to use its advertising offerings.[37]

82. Pixels can collect a shocking amount of information regarding an individual's online behavior—including the webpages viewed by the user, the amount of time spent by the user on specific webpages, the buttons and hyperlinks that the user clicks while using a website, the items that the user adds to an online shopping cart, the purchases that a user makes through an online retailer, the text

---

[35] *Id.*

[36] Aleecia M. McDonald & Lorrie Faith Cantor, *The Cost of Reading Privacy Policies*, I/S: A JOURNAL OF LAW AND POL. FOR THE INFO. SOC. (2008), *available online at*: https://lorrie.cranor.org/pubs/readingPolicyCost-authorDraft.pdf.

[37] *Lurking Beneath the Surface: Hidden Impacts of Pixel Tracking*, FEDERAL TRADE COMMISSION – OFFICE OF TECHNOLOGY (Mar. 6, 2023), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking (last visited Jan. 26, 2026).

entered by the user into a website search bar, and even the information provided by the user on an online form—all transmitted in real-time as the user navigates a website.[38]

83. But most internet users are completely unaware that substantial information about their internet usage is being collected through tracking Pixels. The FTC warns that:

> Traditional controls such as blocking third party cookies may not entirely prevent pixels from collecting and sharing information. Additionally, many consumers may not realize that tracking pixels exist because they're invisibly embedded within web pages that users might interact with…Academic and public reporting teams have found that thousands of the most visited webpages have pixels and other methods that leak personal information to third parties.[39]

**ii. The Pixels Installed on the Website Transmit Personally Identifiable Information and Protected Health Information to the Tracking Tool Providers.**

84. Every website is hosted by a computer "server" that holds the website's contents.

85. To access a website, individuals use "web browsers." Web browsers are software applications that allow consumers to navigate the web and view and exchange electronic information and communications over the Internet. Each "client device" (such as a computer, tablet, or smartphone) accesses web content through a web browser (such as Google's Chrome, Mozilla's Firefox, Apple's Safari, or Microsoft's Edge).

86. Communications between a website server and web browser consists of Requests and Responses. Any given browsing session may consist of hundreds or even thousands of individual Requests and Responses. A web browser's Request essentially asks the website to provide certain information, such as the contents of a given webpage when the user clicks a link, and the Response from the website sends back the requested information – the web pages' images, words, buttons, and other features that the browser shows on the user's screen as they navigate the website.

---

[38] *See id.*; *How does retargeting on Facebook help your business?*, META, https://www.facebook.com/business/goals/retargeting (last visited Jan. 26, 2026); Tom Kemp, *"Oops! I Did It Again" … Meta Pixel Still Hoovering Up Our Sensitive Data*, MEDIUM, https://tomkemp00.medium.com/oops-i-did-it-again-meta-pixel-still-hoovering-up-our-sensitive-data-f99c7b779d47#_ftn1 (last visited Jan. 26, 2026).

[39] *Lurking Beneath the Surface, supra* note 36.

87. Additionally, on most websites, the Response sent back to the user's web browser directs the browser to create small files known as 'cookies' on the user's device.[40] These cookies are saved by the user's web browser, and are used to identify the website user as they browse the website or on subsequent visits to the site.[41] For example, in a more innocuous use case, a cookie may allow the website to remember a user's name and password, language settings, or shopping cart contents.[42]

88. When a Google or Facebook user logs onto their account, their web browser records a Google or Facebook tracking cookie.[43] These cookies include a specific line of code that links the web browser to the user's Google or Facebook account.[44]

89. The Tracking Tool Providers' Pixels use cookies, but operate differently than cookies. Rather than directing the browser to save a file on the user's device, the Pixels acquires information from the browser, without notifying the user. The information can include details about the user, his or her interactions with the Website, and information about the user's environment (*e.g.,* type of device, type of browser, and sometimes even the physical location of the device).

90. Simultaneously, the Tracking Tool Providers' Pixels, like those installed on Defendant's Website, request identifying information from any of the Tracking Tool Providers' cookies previously installed on the user's web browser.

91. This user data is transmitted back to the Tracking Tool Providers contemporaneously as the user navigates the website. As a result, the Tracking Tool Providers can link all of the user information collected by their Pixels on the Defendant's Website to the user's identity, via the user's Google or Facebook profile. Thus, even if a user never actually logs into a website, or fills out a form, the website, along with the Tracking Tool Providers, can know the user's identity.

---

[40] *What is a web browser?*, MOZILLA, https://www.mozilla.org/en-US/firefox/browsers/what-is-a-browser/ (last accessed March 10, 2026).
[41] *Id.*
[42] *Id.*
[43] Cyphers, *supra* note 19.
[44] *Id.*

92. A remarkable number of Americans possess a Googe and/or Facebook account. According to a 2023 survey, 68-percent of Americans report that they are users of Facebook.[45] One-third of Americans have accounts with Google's Gmail e-mail client, and over 80-percent of Americans use YouTube, Google's video client.[46] When these users visit a website, like Defendant's, that utilizes Google and/or Facebook's Tracking Tools, any information collected by the Pixels can be linked to the user's identity through the Google or Facebook cookies installed on the user's web browser.

93. However, it is not only the Tracking Tool Providers' account holders that are at risk of having Pixel-collected website data linked to their identities. Rather, the Tracking Tool Providers utilize sophisticated data tracking methods to identify even those few users who do not have the Tracking Tool Providers account.

94. The Tracking Tool Providers' Pixels, like those on Defendant's website, can acquire information about the user's device and browser, such as their screen resolution, time zone setting, browser software type and version, operating system type and version, language setting, and IP address.

95. An internet user's combination of such device and browser characteristics, commonly referred to as their "browser fingerprint," is "often unique."[47] By tracking this browser fingerprint, the Tracking Tool Providers are able to compile a user's activity across the internet.[48] And, as the Tracking Tool Providers continuously compile user data over time, their understanding of the user's browser

---

[45] Katherine Schaeffer, *5 facts about how Americans use Facebook, two decades after its launch*, PEW RESEARCH (Feb. 2, 2024), https://www.pewresearch.org/short-reads/2024/02/02/5-facts-about-how-americans-use-facebook-two-decades-after-its-launch/ (last accessed March 10, 2026).

[46] *See* Harsha Kiran, *49 Gmail Statistics To Show How Big It Is In 2024*, TECHJURY (Jan. 3, 2024), https://techjury.net/blog/gmail-statistics/ (last accessed March 10, 2026) ("Gmail accounts for 130.9 million of the total email users in the US"). The United States population is approximately 337.4 million. *See* UNITED STATES CENSUS BUREAU, https://www.census.gov/popclock/ (last accessed Aug. 27, 2025); Jeffrey Gottfried, *Americans' Social Media Use*, PEW RESEARCH (Jan. 31, 2024), https://www.pewresearch.org/internet/2024/01/31/americans-social-media-use/ (last visited March 10, 2026

[47] Cyphers, *supra* note 19.

[48] *Id.*

fingerprint becomes more sophisticated such that they need only to collect a single piece of identifying information to identify the user linked to a browser fingerprint. Indeed, in 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[49]

**iii. Defendant Disclosed Plaintiff's and Class Members' Sensitive Health Information to the Tracking Tool Providers.**

96. Plaintiffs and Class Members used Daybreak's Website to research and access health treatments and services related to sleep apnea. While visiting Daybreak's Website, Plaintiffs and Class Members each took Daybreak's Sleep Apnea Assessment.

97. Unbeknownst to Plaintiffs and Class Members, Defendant intentionally configured the Tracking Tools installed on the Website to capture and transmit the Sensitive Health Information that they communicated to Defendant through the Website to third parties, including Google and Facebook.

98. The following screenshots ("Figures 1-5") depict examples of the network transmissions made by the Tracking Tools installed on the Website when users complete Daybreak's Sleep Apnea Assessment or add an item to their online shopping carts. The information provided in Figures 1-5 is exemplar information collected on the Website, and is not Plaintiffs' information, but the Tracking Tools installed on the Website collected the same or similar information about Plaintiffs.

99. As Figures 1-3 show, when users complete the Sleep Apnea Assessment on the Website, the Sensitive Health Information requested and contemporaneously transmitted to Google by the Tracking Tools installed on the Website includes the user's answers to each question, including whether they have been diagnosed with sleep apnea, whether they have undergone a sleep test in the past two years, whether they have used CPAP, the symptoms they have experienced,  and the final results of the Sleep Apnea Assessment. This information was transmitted to Google accompanied by specific lines of code linking the Sensitive Health Information provided by Plaintiffs he identifier number attached to Google's "cid" and "sid" cookies, which identify, which link the user's Website

[49] Yinzhi Cao, Song Li & Erik Wijmans, *(Cross-)Browser Fingerprinting via OS and Hardware Level Features* (Network & Distributed Sys. Symp., 2017) https://www.ndss-symposium.org/wp-content/uploads/2017/09/ndss2017_02B-3_Cao_paper.pdf.

behavior to the user's Google account. This information was also transmitted along with other information that is commonly used to create a browser fingerprint, such as the user's language selection, screen resolution, operating system software and version number, and internet browser software and version number.

**▼ Query String Parameters** View source View URL-encoded

<table>
<tr><td>v</td><td>2</td></tr>
<tr><td>tid</td><td>G-5MD42GFPZ9</td></tr>
<tr><td>gtm</td><td>45je6171v9167414398za20gzb9138044662zd9138044662</td></tr>
<tr><td>_p</td><td>1768237606611</td></tr>
<tr><td>gcd</td><td>13l3l3l3l1l1</td></tr>
<tr><td>npa</td><td>0</td></tr>
<tr><td>dma</td><td>0</td></tr>
<tr><td>cid</td><td>1677020225.1768236969</td></tr>
<tr><td>ul</td><td>en-us</td></tr>
<tr><td>sr</td><td>2560x1440</td></tr>
<tr><td>uaa</td><td>x86</td></tr>
<tr><td>uab</td><td>64</td></tr>
<tr><td>uafvl</td><td>Microsoft%20Edge;143.0.3650.96|Chromium;143.0.7499.147|Not%20A(Brand;24.0.0.0</td></tr>
<tr><td>uamb</td><td>0</td></tr>
<tr><td>uam</td><td></td></tr>
<tr><td>uap</td><td>Windows</td></tr>
<tr><td>uapv</td><td>19.0.0</td></tr>
<tr><td>uaw</td><td>0</td></tr>
<tr><td>are</td><td>1</td></tr>
<tr><td>frm</td><td>0</td></tr>
<tr><td>pscdl</td><td>noapi</td></tr>
<tr><td>_eu</td><td>AAAAAAQ</td></tr>
<tr><td>_s</td><td>5</td></tr>
<tr><td>tag_exp</td><td>103116026~103200004~104527907~104528500~104684208~104684211~105391253~115495938~115938465~115938468~116184927~116184929~116514482~116682875~116744867~116910502</td></tr>
<tr><td>uid</td><td>EI7v5y7FD7mEwT8ZS5oj7</td></tr>
<tr><td>sid</td><td>1768236968</td></tr>
<tr><td>sct</td><td>1</td></tr>
<tr><td>seg</td><td>1</td></tr>
<tr><td>dl</td><td>https://www.thedaybreak.com/assessment/results?snore=2&gasp=1&tired=3&apnea=2&mask=3&sms_consent=null&utm=%5Bobject+Object%5D</td></tr>
<tr><td>dr</td><td>https://www.thedaybreak.com/assessment</td></tr>
<tr><td>dt</td><td>Results from your Assessment | Daybreak</td></tr>
<tr><td>_tu</td><td>CA</td></tr>
<tr><td>en</td><td>user_engagement</td></tr>
<tr><td>ep.visitor_type</td><td>guest</td></tr>
<tr><td>_et</td><td>1254</td></tr>
<tr><td>tfd</td><td>51556</td></tr>
</table>

*[Remainder of page intentionally left blank]*

Headers Payload Preview Response Initiator Timing Cookies

▼ Query String Parameters View source View URL-encoded


| | |
|---|---|
| v | 2 |
| tid | G-5MD42GFPZ9 |
| gtm | 45je6171v9167414398z89138044662za20gzb9138044662zd9138044662 |
| _p | 1768237200477 |
| _gaz | 1 |
| gcd | 13l3l3l3l1l1 |
| npa | 0 |
| dma | 0 |
| cid | 1677020225.1768236969 |
| ul | en-us |
| sr | 2560x1440 |
| uaa | x86 |
| uab | 64 |
| uafvl | Microsoft%20Edge;143.0.3650.96\|Chromium;143.0.7499.147\|Not%20A(Brand;24.0.0.0 |
| uamb | 0 |
| uam | |
| uap | Windows |
| uapv | 19.0.0 |
| uaw | 0 |
| are | 1 |
| frm | 0 |
| pscdl | noapi |
| _eu | AAAAAAQ |
| _s | 10 |
| tag_exp | 103116026~103200004~104527906~104528501~104684208~104684211~105391252~115938466~115938469~116184927~116184929~116514483 |
| uid | El7v5y7FD7mEwT8ZS5oj7 |
| sid | 1768236968 |
| sct | 1 |
| seg | 1 |
| dl | https://www.thedaybreak.com/assessment |
| dr | https://www.thedaybreak.com/why-daybreak |
| dt | Assessment \| Daybreak |
| en | sa_quiz_tired |
| ep.visitor_type | guest |
| ep.type | behavior |
| ep.label | C Yes, I'm constantly fatigued |
| ep.action | sa_quiz_tired |
| _et | 1562 |
| tfd | 350070 |


*[Remainder of page intentionally left blank]*




| | |
|---|---|
| v | 2 |
| tid | G-5MD42GFPZ9 |
| gtm | 45je6171v9167414398za20gzb9138044662zd9138044662 |
| _p | 1768237606611 |
| gcd | 13l3l3l3l1l1 |
| npa | 0 |
| dma | 0 |
| cid | 1677020225.1768236969 |
| ul | en-us |
| sr | 2560x1440 |
| uaa | x86 |
| uab | 64 |
| uafvl | Microsoft%20Edge;143.0.3650.96\|Chromium;143.0.7499.147\|Not%20A(Brand;24.0.0.0 |
| uamb | 0 |
| uam | |
| uap | Windows |
| uapv | 19.0.0 |
| uaw | 0 |
| are | 1 |
| frm | 0 |
| pscdl | noapi |
| _eu | AAAAAAQ |
| _s | 5 |
| tag_exp | 103116026~103200004~104527907~104528500~104684208~104684211~105391253~115495938~115938465~115938468~116184927~116184929~116514482~116682875~116744867~116910502 |
| uid | El7v5y7FD7mEwT8ZS5oj7 |
| sid | 1768236968 |
| sct | 1 |
| seg | 1 |
| dl | https://www.thedaybreak.com/assessment/results?snore=2&gasp=1&tired=3&apnea=2&mask=3&sms_consent=null&utm=%5Bobject+Object%5D |
| dr | https://www.thedaybreak.com/assessment |
| dt | Results from your Assessment \| Daybreak |
| _tu | CA |
| en | user_engagement |
| ep.visitor_type | guest |
| _et | 1254 |
| tfd | 51556 |

*Figures 1-3. Screenshots depicting back-end network traffic from Defendant's Website which show the information transmitted to Google when Website users complete the Sleep Apnea Assessment.*

100. Daybreak also informs Google when Website users order a sleep test. As Figure 4 shows, when Website users add a sleep test to their online shopping cart, the information transmitted to Google includes the fact that the user added a "Medical Test – At Home Sleep Test" from "Daybreak Healthcare" to their online shopping cart, as week as the identifier number attached to Google's "cid" and "sid" cookies, which identify, which link the user's Website behavior to the user's Google account, and other information that is commonly used to create a browser fingerprint.

**Query String Parameters** View source View URL-encoded

| | |
|---|---|
| v | 2 |
| tid | G-5MD42GFPZ9 |
| gtm | 45je6171v9167414398z89138044662za20gzb9138044662zd9138044662 |
| _p | 1768237606611 |
| gcd | 13l3l3l3l1l1 |
| npa | 0 |
| dma | 0 |
| cid | 1677020225.1768236969 |
| ul | en-us |
| sr | 2560x1440 |
| uaa | x86 |
| uab | 64 |
| uafvl | Microsoft%20Edge;143.0.3650.96\|Chromium;143.0.7499.147\|Not%20A(Brand;24.0.0.0 |
| uamb | 0 |
| uam | |
| uap | Windows |
| uapv | 19.0.0 |
| uaw | 0 |
| are | 1 |
| frm | 0 |
| pscdl | noapi |
| _eu | AAAAAAQ |
| tag_exp | 103116026~103200004~104527907~104528500~104684208~104684211~105391253~115495938~115938465~115938468~116184927~116184929~116514482~116682875~116744867~116910502 |
| uid | EI7v5y7FD7mEwT8ZS5oj7 |
| cu | USD |
| sid | 1768236968 |
| sct | 1 |
| seg | 1 |
| dl | https://www.thedaybreak.com/assessment/results?snore=2&gasp=1&tired=3&apnea=2&mask=3&sms_consent=null&utm=%5Bobject+Object%5D |
| dr | https://www.thedaybreak.com/assessment |
| dt | Results from your Assessment \| Daybreak |
| _s | 4 |
| tfd | 51555 |

**Request Payload**

en=add_to_cart&pr1=idsleep-test-v1~k0item_variant_id~v08797385982269~k1item_product_id~v18797385982269~nmAt-Home%20Sleep%20Test~ln~li~brDaybreak~caHealth%20Care%20%2F%20Medical%20Tests~vaAt-Home%20Sleep%20Test~qt1~pr159.95&ep.visitor_type=guest&_et=44
en=view_cart&ep.visitor_type=guest&ep.cart_total=129.95&_et=9&_tu=CA

*Figure 4. Screenshot depicting back-end network traffic from Defendant's Website which show the information transmitted to Google when Website users order an at-home sleep test.*

101. Daybreak also informs Facebook about actions taken by users on the Website. As the below screenshot ("Figure 5") shows, when Website users navigate the Website, information collected and transmitted by Facebook's Tracking Tools shows the specific webpages accessed by the user, linked to Facebook's "fbp" cookie, which identifies and links the user's Website behavior to the user's Facebook account.

*[Remainder of page intentionally left blank]*


Headers | Payload | Preview | Response | Initiator | Timing

Query String Parameters | View source | View URL-encoded

| | |
|---|---|
| id | 3595552084008898 |
| ev | PageView |
| dl | https://www.thedaybreak.com |
| rl | |
| if | false |
| ts | 1768237201493 |
| sw | 2560 |
| sh | 1440 |
| cud[external_id] | ^^#*#*#^^#*^*^#^^#**# |
| ncud[external_id] | **#*#*#**#****#**#**# |
| ud[external_id] | 3a922348d38ed71944ba761cd43c248c83175c1cd0d36918bb47b36ced99612f |
| aud[external_id] | 3a922348d38ed71944ba761cd43c248c83175c1cd0d36918bb47b36ced99612f |
| v | 2.9.248 |
| r | stable |
| ec | 0 |
| o | 12316 |
| fbp | fb.1.1768236968195.2778093894 |
| cs_est | true |
| pm | 1 |
| hrl | 691fed |
| ler | empty |
| plt | 380.2000000476837 |
| it | 1768237201410 |
| coo | false |
| eid | Y7j6Q_xF6glINomen5t27 |
| tm | 1 |
| cs_cc | 1 |
| cas | 8678780582199291,9752446428126199,9293432117392346,8076006435837203,8712940645438288,7998998370198471,7584387955022967,26152607421021005,8340434552648055,7549431041850695,7284367881673906,7956507277803329,7625773644165452,7592036964242228 |
| dlc | 1 |
| expv2[0] | pl0 |
| expv2[1] | el3 |
| expv2[2] | bc1 |
| expv2[3] | mr0 |
| expv2[4] | im1 |
| rqm | GET |

*Figures 5. Screenshot depicting back-end network traffic from Defendant's Website which shows the information transmitted to Facebook when Website users navigate the Website.*

102. In their default state, Google and Facebook's Pixels record and transmit only "automatic events," consisting largely of routine user behavior, such as URLs visited by internet users.[50]

103. But here, Defendant intentionally configured the Google and Facebook Pixels on its Website to collect and transmit additional user data, including their specific responses to the questions in the Sleep Apnea Assessment, and the specific products that they ordered through the Website.

---

[50] *Automatically Collected Events*, GOOGLE ANALYTICS HELP, https://support.google.com/analytics/answer/9234069, (last visited on March 10, 2026); *About automatic events*, META BUSINESS HELP CENTER, https://www.facebook.com/business/help/1292598407460746?id=1205376682832142 (last visited on March 10, 2026).

104. By installing third-party Tracking Tools, including tracking Pixels, on its Website, and by further configuring those Pixels to collect its Website user's Sensitive Health Information, Defendant knowingly and intentionally caused Plaintiffs' and Class Members' Sensitive Health Information to be transmitted to third parties, including Google and Facebook.

### B. DEFENDANT DISCLOSED PLAINTIFFS' AND CLASS MEMBERS' SENSITIVE HEALTH INFORMATION TO THIRD PARTIES WITHOUT THEIR KNOWLEDGE OR CONSENT

#### i. Defendant Failed to Inform Plaintiff and Class Members of its Disclosure of their Sensitive Health Information.

105. Defendant breached Plaintiff's and Class Members' right to privacy by unlawfully disclosing their Sensitive Health Information to third parties, including Google and Facebook.

106. Specifically, Plaintiff and Class Members had a reasonable expectation of privacy. Defendant did not inform Plaintiff that it was sharing his Sensitive Health Information with third parties, including Google and Facebook.

107. By engaging in this improper sharing of information without Plaintiff's and Class Members' consent, Defendant breached Plaintiff's and Class Members' right to privacy and unlawfully disclosed their Sensitive Health Information.

108. Despite never telling users like Plaintiff and Class Members, Defendant allowed third parties such as Google and Facebook to intercept Plaintiff's and Class Members' Sensitive Health Information and use it for advertising purposes.

#### ii. The Tracking Tools Used by Defendant Were Imperceptible to Plaintiffs and Class Members

109. The Tracking Tools installed on Defendant's Website were invisible to Plaintiffs and Class Members. Without analyzing the network information transmitted by Defendant's Website through examination of its source code or the use of sophisticated web developer tools, there was no way for a Website user to discover the presence of the Tracking Tools. As a result, typical internet users, such as Plaintiffs and Class Members, were unable to detect the Tracking Tools on Defendant's Website.

110. Plaintiffs and Class Members were shown no disclaimer or warning that their Sensitive Health Information would be disclosed to any unauthorized third party without their express consent.

111. Plaintiffs and Class Members did not know that their Sensitive Health Information was being collected and transmitted to an unauthorized third party.

112. Because Plaintiffs and Class Members were not aware of the Google and Facebook Pixels on Defendant's website, or that their Sensitive Health Information would be collected and transmitted to Google and Facebook, they could not and did not consent to Defendant's conduct.

## C. DEFENDANT WAS ENRICHED BY ITS DISCLOSURE OF PLAINTIFFS' AND CLASS MEMBERS' SENSITIVE HEALTH INFORMATION TO THIRD PARTIES

### i. Defendant Received Material Benefits in Exchange for Plaintiffs' Sensitive Health Information.

113. As explained, *supra*, users of Google and Facebook's Business Tools, like Defendant, receive access to advertising and marketing analytics services in exchange for installing Google and Facebook's Tracking Tools on their website.

114. Upon information and belief, Defendant, as a user of Google and Facebook's Business Tools, received compensation in the form of advanced advertising services and cost-effective marketing on third-party platforms in exchange for allowing Google and Facebook to collect Plaintiffs' and Class Members' Sensitive Health Information.

### ii. Plaintiffs' And Class Members' Data Had Financial Value

115. Moreover, Plaintiffs' and Class Members' Sensitive Health Information had value, and Defendant's disclosure and interception of that Sensitive Health Information harmed Plaintiffs and the Class.

//

//

//

116. According to Facebook's annual reports, the value it derives from user data has continuously risen. "In 2013, the average American's data was worth about $19 per year in advertising sales to Facebook, according to its financial statements. In 2020, [it] was worth $164 per year."[51]

117. According to Facebook's annual reports, the value it derives from user data has continuously risen. "In 2013, the average American's data was worth about $19 per year in advertising sales to Facebook, according to its financial statements. In 2020, [it] was worth $164 per year."[52]

118. Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.

119. Several companies have products through which they pay consumers for a license to track certain information. Google, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies that pay for browsing history information.

120. Facebook itself has paid users for their digital information, including browsing history. Until 2019, Facebook ran a "Facebook Research" app through which it paid $20 a month for a license to collect browsing history information and other communications from consumers between ages 13 and 35.[53]

121. The unauthorized disclosure of Plaintiffs' and Class Members' private and Sensitive Health Information has diminished the value of that information, resulting in harm to Plaintiffs and Class Members.

//

//

---

[51] Geoffrey A. Fowler, *There's no escape from Facebook, even if you don't use it*, THE WASHINGTON POST (Aug. 29, 2021), https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/ (last visited Mar. 10, 2026).

[52] Geoffrey A. Fowler, *There's no escape from Facebook, even if you don't use it*, THE WASHINGTON POST (Aug. 29, 2021), https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/ (last visited Mar. 10, 2026).

[53] Louis Matsakis, WIRED (Jan. 30, 2019), https://www.wired.com/story/facebook-research-app-root-certificate/ (last visited Mar. 10, 2026).

**D. DEFENDANT'S USE OF THE TRACKING TOOLS VIOLATES HIPAA.**

122. The disclosure of Plaintiff's and Class Members' Sensitive Health Information via the Pixels contravenes the letter and spirit of HIPAA's "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") which governs how health care providers must safeguard and protect Sensitive Health Information.[54]

123. The HIPAA Privacy Rule sets forth policies to protect all IIHI that is held or transmitted by a covered entity such as Defendant. These are the 18 HIPAA Identifiers that are considered personally identifiable information because this information can be used to identify, contact, or locate a specific person or can be used with other sources (such as a person's Google account) to identify a single individual. When IIHI is used in conjunction with one's physical or mental health or condition, health care, and/or one's payment for that health care, it becomes PHI.[55]

124. While healthcare entities regulated under HIPAA may use third-party tracking tools, such as the Tracking Tools, they can do so only in a very limited way, to perform analysis on data key to operations.

125. Simply put, further to the HIPAA Privacy Rule, covered entities such as Defendant are simply ***not*** permitted to use tracking technology tools in a way that exposes Sensitive Health Information to any third party without express and informed consent.

126. Under federal law, a healthcare provider may not disclose personally identifiable, non-public medical information about a patient, a potential patient, or household member of a patient for

---

[54] *The HIPAA Privacy Rule*, https://www.hhs.gov/hipaa/for-professionals/privacy/index.html (last visited Jan. 26, 2026).

[55] *Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, https://www.hhs.gov/hipaa/for-professionals/special-topics/de-identification/index.html (last visited Jan. 26, 2026) (HIPAA Identifiers include name; address (all geographic subdivisions smaller than state, including street address, city county, and zip code); all elements (except years) of dates related to an individual (including birthdate, admission date, discharge date, date of death, and exact age); telephone numbers; email address; medical record number; health plan beneficiary number; account number; device identifiers and serial numbers; web URL; internet protocol (IP) address; and any other characteristic that could uniquely identify the individual).

marketing purposes without the patients' express written authorization.[56]

127. The Privacy Rule broadly defines PHI as IIHI that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

128. IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

129. Under the HIPAA de-identification rule, health information is not considered individually identifiable under only two circumstances: if, (1) an expert has "determine[d] that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "document[ed] the methods and results of the analysis that justify such determination.'" Or, (2), if all enumerated identifiers of the individual or their family members are removed, including names, medical record numbers, account numbers, device identifiers, device serial numbers, URLs, IP addresses, and "[a]ny other unique identifying number, characteristic, or code," so that the entity does not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information." C.F.R. § 160.514.

130. The HIPAA Privacy Rule requires any "covered entity"—which includes healthcare providers like Daybreak—to maintain appropriate safeguards to protect the privacy of PHI and set limits and conditions on the uses and disclosures that may be made of PHI without authorization. 45

[56] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

C.F.R. §§ 160.103, 164.502.

131. Even the fact that an individual is receiving a medical service, *i.e.*, is a patient of a particular entity, can be PHI.

132. The U.S. Department of Health and Human Services ("HHS") has instructed health care providers that, while identifying information alone is not necessarily PHI if it were part of a public source such as a phonebook because it is not related to health data, "[i]f such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI."[57]

133. Consistent with this restriction, the HHS has issued marketing guidance that provides, "[w]ith limited exceptions, the [Privacy] Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing . . . . Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients or enrollees to third parties without obtaining authorization from each person on the list."[58]

134. Here, Defendant provided PHI to third parties in violation of the Privacy Rule.

135. HIPAA also requires Defendant to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information," 45 C.F.R. § 164.306(c), and to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

136. Defendant further failed to comply with other HIPAA safeguard regulations as follows:

a. Failing to ensure the confidentiality and integrity of electronic PHI

[57] *See Guidance Regarding Methods for De-Identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, HHS, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (last visited Jan. 26, 2026).

[58] *Marketing*, HHS, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html (last visited Jan. 26, 2026).

that Defendant created, received, maintained, and transmitted in violation of 45 C.F.R. § 164.306(a)(1);

b. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

c. Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

d. Failing to protect against reasonably anticipated uses or disclosures of electronic PHI not permitted under the privacy rules pertaining to IIHI in violation of 45 C.F.R. § 164.306(a)(3);

e. Failing to effectively train its workforces (including independent contractors) on the policies and procedures for PHI as necessary and appropriate to carry out job functions while maintaining security of PHI beyond using imitation phishing email software in violation of 45 C.F.R. §§ 164.530(b) and 164.308(a)(5); and

f. Failing to design, implement, and enforce policies and procedures that would establish physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. § 164.530(c).

137. HHS has repeatedly instructed for years that patient status is protected by the HIPAA Privacy Rule:

a. "The sale of a patient list to a marketing firm" is not permitted under HIPAA. 65 Fed. Reg. 82717 (Dec. 28, 2000);

b. "A covered entity must have the individual's prior written authorization to use or disclose protected health information for marketing communications," which includes disclosure of mere patient status through a patient list. 67 Fed. Reg. 53186 (Aug. 14, 2002); and

c. It would be a HIPAA violation "if a covered entity impermissibly disclosed a list of patient names, addresses, and hospital identification numbers." 78 Fed. Reg. 5642 (Jan. 25, 2013).

138. In other words, HHS has expressly stated that Defendant has violated HIPAA Rules by implementing the Tracking Tools. Courts, including in this District, have found the same under near-identical circumstances.

**E. PLAINTIFFS' AND CLASS MEMBERS' REASONABLE EXPECTATION OF PRIVACY.**

139. At all times when Plaintiffs and Class Members provided their Sensitive Health Information to Defendant, they each had a reasonable expectation that the information would remain confidential and that Defendant would not share the Sensitive Health Information with third parties for a commercial purpose, unrelated to providing them with medical care.

140. Privacy polls and studies show that the overwhelming majority of Americans consider obtaining an individual's affirmative informed consent before a company collects and shares that individual's data to be one of the most important privacy rights.

141. For example, a recent Consumer Reports study shows that 92-percent of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumer data, and the same percentage believe those companies and websites should be required to provide consumers with a complete list of the data that is collected about them.[59]

142. Moreover, Americans are particularly interested in the safety of their health information. Over 50-percent of Americans believe that "medical-records privacy is not sufficiently protected today by law and organizational practices."[60]

143. And, in a study performed by the National Institutes of Health, nearly 80-percent of respondents reported being "very concerned" or "concerned" about the privacy of medical records.[61]

144. Personal data privacy and obtaining consent to share Sensitive Health Information are material to Plaintiffs and Class Members.

---

[59] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, CONSUMER REPORTS (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907 (last visited March 10, 2026).

[60] *The Value of Data*, TRUSTWAVE (2017), *available online at*: https://www.infopoint-security.de/media/TrustwaveValue_of_Data_Report_Final_PDF.pdf.

[61] Daniel S Gaylin, Adil Moiduddin, Shamis Mohamoud, Katie Lundeen, Jennifer A Kelly, *Public Attitudes about Health Information Technology, and Its Relationship to Health Care Quality, Costs, and Privacy*, HEALTH SERV. RES. (2011), *available online at* https://pmc.ncbi.nlm.nih.gov/articles/PMC3097409/pdf/hesr0046-0920.pdf.

**TOLLING AND ESTOPPEL**

145. Any applicable statutes of limitation have been tolled by Defendant's knowing and active concealment of its incorporation of Google and Facebook's Tracking Tools into its Website.

146. The Pixels and other tracking tools on Defendant's Website were and are invisible to the average website visitor.

147. Through no fault or lack of diligence, Plaintiffs and Class Members were deceived and could not reasonably discover Defendant's deception and unlawful conduct.

148. Plaintiffs were ignorant of the information essential to pursue their claims, without any fault or lack of diligence on their part.

149. Defendant had exclusive knowledge that its Website incorporated the Pixels and other Tracking Tools and yet failed to disclose to customers, including Plaintiffs and Class Members, that by requesting a consultation via the Website, Plaintiffs' and Class Members' Sensitive Health Information would be disclosed or released to unauthorized third parties, including Google and Facebook.

150. Under the circumstances, Defendant was under a duty to disclose the nature, significance, and consequences of its collection and treatment of its customers' Sensitive Health Information. In fact, to the present, Defendant has not conceded, acknowledged, or otherwise indicated to its customers that it has disclosed or released their Sensitive Health Information to unauthorized third parties. Accordingly, Defendant is estopped from relying on any statute of limitations.

151. Moreover, all applicable statutes of limitation have also been tolled pursuant to the discovery rule.

152. The earliest Plaintiffs and Class Members could have known about Defendant's conduct was approximately in March 2026, when Plaintiffs contacted the undersigned counsel to discuss their potential claims against Defendants.

## CLASS ALLEGATIONS

153. This action is brought by the named Plaintiffs on their own behalf, and on behalf of a proposed Class of all other persons similarly situated under Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4).

154. Specifically, the Nationwide Class that Plaintiffs seek to represent is defined as follows:

> **The Nationwide Class**
> All natural persons who used the Website, and whose Sensitive Health Information was disclosed or transmitted to Google, Facebook, or any other unauthorized third party.

155. In addition to claims asserted on behalf of the Nationwide Class, Plaintiffs assert claims on behalf of separate Arkansas, Kansas, Pennsylvania, Florida and Texas Subclasses, which are defined as follows:

> **Arkansas Subclass**
> All natural persons residing in the State of Arkansas who used the Website, and whose Sensitive Health Information was disclosed or transmitted to Google, Facebook, or any other unauthorized third party.

> **Kansas Subclass**
> All natural persons residing in the State of Kansas who used the Website, and whose Sensitive Health Information was disclosed or transmitted to Google, Facebook, or any other unauthorized third party.

> **Pennsylvania Subclass**
> All natural persons residing in the State of Pennsylvania who used the Website, and whose Sensitive Health Information was disclosed or transmitted to Google, Facebook, or any other unauthorized third party.

> **Texas Subclass**
> All natural persons residing in the State of Florida who used the Website, and whose Sensitive Health Information was disclosed or transmitted to Google, Facebook, or any other unauthorized third party.

> **Florida Subclass**
> All natural persons residing in the State of Florida who used the Website, and whose Sensitive Health Information was disclosed or transmitted to Google, Facebook, or any other unauthorized third party.

156. Excluded from the proposed Class are any claims for personal injury, wrongful death, or other property damage sustained by the Class; Defendant and its parents or subsidiaries, any entities in which it has a controlling interest, as well as its officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns; and any Judge conducting any proceeding in this action and members of their immediate families.

157. Plaintiffs reserve the right to amend the definitions of the Classes or add subclasses if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

158. **Numerosity.** The Class is so numerous that the individual joinder of all members is impracticable. There are at least 1,000 individuals that have been impacted by Defendant's actions. Moreover, the exact number of those impacted is generally ascertainable by appropriate discovery and is in the exclusive control of Defendant.

159. **Commonality.** Common questions of law or fact arising from Defendant's conduct exist as to all members of the Class, which predominate over any questions affecting only individual Class Members. These common questions include, but are not limited to, the following:

a) Whether and to what extent Defendant had a duty to protect the Sensitive Health Information of Plaintiff and Class Members;

b) Whether Defendant had duties not to disclose the Sensitive Health Information of Plaintiff and Class Members to unauthorized third parties;

c) Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their Sensitive Health Information would be disclosed to third parties;

d) Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their Sensitive Health Information was being disclosed without their consent;

e) Whether Defendant adequately addressed and fixed the practices which permitted the unauthorized disclosure of users' Sensitive Health Information;

f) Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to keep the Sensitive Health Information belonging to Plaintiff and Class Members free from unauthorized disclosure;

g) Whether Defendant violated the statutes asserted as claims in this Complaint;

h) Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct;

i) Whether Defendant knowingly omitted material representations with respect to its data security and/or privacy practices; and

j) Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Defendant's disclosure of their Sensitive Health Information.

160. **Typicality.** Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Sensitive Health Information, like that of every other Class Member, was compromised as a result of Defendant's incorporation and use of the Tracking Tools.

161. **Adequacy.** Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class in that Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the members of the Class and the infringement of the rights and the damages Plaintiffs have suffered are typical of other Class Members. Plaintiffs have also retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.

162. **Predominance.** Defendant has engaged in a common course of conduct toward Plaintiffs and Class Members in that all the Plaintiffs' and Class Members' data was unlawfully stored and disclosed to unauthorized third parties, including third parties like Google and Facebook, in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

163. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is

superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claim is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

164. Defendant acted on grounds that apply generally to the Class as a whole so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

165. Likewise, particular issues under Fed. R. Civ. P. 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a) Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Sensitive Health Information and not disclosing it to unauthorized third parties;

b) Whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Sensitive Health Information;

c) Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

d) Whether Defendant adequately and accurately informed Plaintiff and Class Members that their Sensitive Health Information would be disclosed to third parties;

e) Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties; and

f) Whether Class Members are entitled to actual, consequential, and/or nominal damages and/or injunctive relief as a result of Defendant's wrongful conduct.

166. Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the unauthorized disclosures that have taken place.

**COUNT I**
**Common Law Invasion of Privacy**
***(On Behalf of Plaintiffs and the Nationwide Class or, alternatively, the Arkansas, Kansas, Pennsylvania, Texas and Florida Subclasses)***

167. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 160 as if fully set forth herein.

168. Plaintiffs and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their confidential and/or highly personal Sensitive Health Information; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to the exfiltration of their communications without Plaintiffs' and Class Members' knowledge or consent.

169. Plaintiffs and Class Members had a reasonable expectation of privacy in their communications with Defendant via its Website and the communications platforms and services therein.

170. Plaintiffs and Class Members communicated Sensitive Health Information that they intended for only Defendant to receive and that they understood Defendant would keep private and secure.

171. Defendant's disclosure of the substance and nature of those communications to third parties, including Google and Facebook, without the knowledge and informed consent of Plaintiffs and Class Members is an intentional intrusion on Plaintiffs' and Class Members' solitude or seclusion.

172. Plaintiffs and Class Members had a reasonable expectation of privacy, which included that their communications regarding sensitive, highly personal information would be protected from surreptitious disclosure to third parties.

173. Defendant's disclosure of Plaintiffs' and Class Members' Sensitive Health Information coupled with individually identifying information is highly offensive to the reasonable person.

174. As a result of Defendant's actions, Plaintiffs and Class Members have suffered harm and injury including, but not limited to, an invasion of their privacy rights.

175. Plaintiffs and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to compensatory and/or nominal damages.

176. Plaintiffs and Class Members seek appropriate relief for that injury including, but not limited to, damages that will reasonably compensate Plaintiffs and Class Members for the harm to their privacy interests as a result of the intrusions upon their privacy.

177. Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful and intentional nature of Defendant's actions, directed at injuring Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

178. Plaintiffs also seek such other relief as the Court may deem just and proper.

## COUNT II
## Negligence
***(On Behalf of Plaintiffs and the Nationwide Class or, alternatively, the Arkansas, Kansas, Pennsylvania, Texas and Florida Subclasses)***

179. Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if fully set forth herein.

180. Through their use of Defendant's Website, Plaintiffs and Class Members provided Defendant with their Sensitive Health Information, believing such information would be kept confidential.

181. By collecting and storing this data, Defendant had a duty of care to use reasonable means to secure and safeguard it from unauthorized disclosure to third parties, including Google and Facebook.

182. Defendant negligently failed to take reasonable steps to protect Plaintiffs' and Class Members' Sensitive Health Information from being disclosed to third parties, without their consent, including to Google and Facebook.

183. Defendant further negligently failed to inform Plaintiffs and the Class that it would use their Sensitive Health Information for marketing purposes, or that their Sensitive Health Information would be transmitted to third parties, including Google and Facebook.

184. Defendant knew, or reasonably should have known, that Plaintiffs and the Class would not have provided their Sensitive Health Information to Defendant, had Plaintiffs and the Class known that Defendant intended to use that information for unlawful purposes.

185. Defendant's conduct has caused Plaintiffs and the Class to suffer damages by having their personally identifiable Sensitive Health Information accessed, stored, and disseminated without their knowledge or consent.

186. Plaintiffs and Class Members are entitled to compensatory, nominal, and/or punitive damages.

187. Defendant's negligent conduct is ongoing, in that it still holds the Sensitive Health Information of Plaintiffs and Class Members in an unsafe and unsecure manner. Therefore, Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; and (ii) submit to future annual audits of those systems and monitoring procedures.

## COUNT III

**Breach of Implied Contract**

***(On Behalf of Plaintiffs and the Nationwide Class or, alternatively, the Arkansas, Kansas, Pennsylvania, Texas and Florida Subclasses)***

188. Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if fully set forth herein.

189. When Plaintiffs and Class Members provided their Sensitive Health Information to Defendant in exchange for services, they entered into an implied contract pursuant to which Defendant agreed to safeguard and not disclose their Sensitive Health Information without consent.

190. Plaintiffs and Class Members accepted Defendant's offers and provided their Sensitive Health Information to Defendant.

191. Plaintiffs and Class Members would not have entrusted Defendant with their Sensitive Health Information in the absence of an implied contract between them and Defendant obligating Defendant to not disclose Sensitive Health Information without consent.

192. Defendant breached these implied contracts by disclosing Plaintiffs' and Class Members' Sensitive Health Information to third parties like Google and Facebook.

193. As a direct and proximate result of Defendant's breaches of these implied contracts, Plaintiffs and Class Members sustained damages as alleged herein.

194. Plaintiffs and Class Members are entitled to compensatory, consequential, and/or nominal damages as a result of Defendant's breaches of implied contract.

## COUNT IV
## Unjust Enrichment
***(On Behalf of Plaintiffs and the Nationwide Class or, alternatively, the Arkansas, Kansas, Pennsylvania, Texas and Florida Subclasses)***

195. Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if fully set forth herein.

196. Plaintiffs plead this claim in the alternative to their breach of implied contract claim.

197. Plaintiffs and Class Members conferred a monetary benefit on Defendant. Specifically, they provided their Sensitive Health Information to Defendant, which it exchanged for marketing and advertising services, including to Google and Facebook.

198. Defendant knew that Plaintiffs and Class Members conferred a benefit which Defendant accepted. Defendant profited from the Sensitive Health Information of Plaintiffs and Class Members by exchanging it for marketing and advertising services.

199. In particular, Defendant enriched itself by obtaining the inherent value of Plaintiffs' and Class Members' Sensitive Health Information, and by saving the costs it reasonably should have expended on marketing and/or data security measures to secure Plaintiffs' and Class Members' Sensitive Health Information.

200. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the privacy of their Sensitive Health Information.

201. Under the principles of equity and good conscience, Defendant should not be permitted to retain such benefits obtained by its surreptitious collection and transmission of Plaintiff's and Class Members' Sensitive Health Information.

202. If Plaintiffs and Class Members knew that Defendant had not reasonably secured their Sensitive Health Information, they would not have agreed to provide their Sensitive Health Information to Defendant.

203. Plaintiffs and Class Members have no adequate remedy at law for this count. An unjust enrichment theory provides the equitable disgorgement of profits even where an individual has not suffered a corresponding loss in the form of money damages.

204. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will continue to suffer injury.

205. Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that they unjustly received from them, or to refund the amounts that Plaintiffs and Class Members overpaid for Defendant's services.

## COUNT V
## BREACH OF FIDUCIARY DUTY
***(On Behalf of Plaintiffs and the Nationwide Class or, alternatively, the Arkansas, Kansas, Pennsylvania, Texas and Florida Subclasses)***

206. Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if fully set forth herein.

207. In light of the special relationship between Defendant and Plaintiffs and Class Members, whereby Defendant became guardians of Plaintiffs' and Class Members' Sensitive Health Information, Defendant became a fiduciary by its undertaking and guardianship of the Sensitive Health Information, to act primarily for Plaintiffs and Class Members, (1) for the safeguarding of Plaintiffs' and Class Members' Sensitive Health Information; (2) to timely notify Plaintiffs and Class Members of an unauthorized disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendant did and do store.

208. Defendant has a fiduciary duty to act for the benefit of Plaintiffs and Class Members upon matters within the scope of Defendant's relationship with its patients and former patients to keep their Sensitive Health Information private.

209. Defendant breached its fiduciary duties to Plaintiffs and Class Members by disclosing their Sensitive Health Information to unauthorized third parties, and separately, by failing to notify Plaintiffs and Class Members of this fact.

210. As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiffs and Class Members have suffered and will continue to suffer injury and are entitled to compensatory, nominal, and/or punitive damages, and disgorgement of profits, in an amount to be proven at trial.

## COUNT VI
## BREACH OF CONFIDENCE
***(On Behalf of Plaintiffs and the Nationwide Class or, alternatively, the Arkansas, Kansas, Pennsylvania, Texas and Florida Subclasses)***

211. Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if fully set forth herein.

212. Medical providers have a duty to their patients, potential patients, and former patients to keep non-public medical information completely confidential.

213. Plaintiffs and Class Members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged on the Website.

214. Plaintiffs' and Class Members' reasonable expectations of privacy in the communications exchanged with Defendant were further buttressed by Defendant's express promises on the Website.

215. Contrary to its duties as medical providers and its express promises of confidentiality, Defendant deployed the Tracking Technologies to disclose and transmit Plaintiffs' and Class Members' Sensitive Health Information and the contents of their communications exchanged with Defendant to third parties, including Google.

216. Defendant's disclosures of Plaintiffs' and Class Members' Sensitive Health Information were made without their knowledge, consent or authorization, and were unprivileged.

217. The harm arising from a breach of provider-patient confidentiality includes erosion of the essential confidential relationship between the healthcare provider and the patient.

218. As a direct and proximate cause of Defendant's unauthorized disclosures of patient personally identifiable, non-public medical information, and communications, Plaintiffs and Class Members were damaged by Defendant's breach in that:

a. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

b. Defendant eroded the essential confidential nature of the provider-patient relationship;

c. Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without compensating Plaintiffs and Class Members for the data;

d. Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality;

e. Defendant's actions diminished the value of Plaintiffs' and Class Members' Sensitive Health Information, and

f. Defendant's actions violated the property rights Plaintiffs and Class Members have in their Sensitive Health Information.

219. Plaintiffs and Class Members are therefore entitled to general damages for invasion of their rights in an amount to be determined by a jury and nominal damages for each independent violation. Plaintiffs are also entitled to punitive damages.

**COUNT VII**
**VIOLATIONS OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA")**
**18 U.S.C. § 2511(1), *et seq.***
***(On Behalf of Plaintiffs and the Nationwide Class or, alternatively, the Arkansas, Kansas, Pennsylvania, Texas and Florida Subclasses)***

220. Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if fully set forth herein.

221. The ECPA protects both sending and receipt of communications.

222. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

223. The transmissions of Plaintiffs' Sensitive Health Information to Defendant's Website qualify as "communications" under the ECPA's definition of 18 U.S.C. § 2510(12).

224. Electronic Communications. The transmission of Sensitive Health Information between Plaintiffs and Class Members and Defendant's Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

225. Content. The ECPA defines content, when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

226. Interception. The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other

device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

227. Electronic, Mechanical or Other Device. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a. Plaintiffs' and Class Members' browsers;

b. Plaintiffs' and Class Members' computing devices;

c. Defendant's web-servers; and

d. The Pixel code deployed by Defendant to effectuate the sending and acquisition of Website user communications.

228. By utilizing and embedding the Pixels on its Website, Defendant intentionally intercepted, endeavored to intercept, and procured another person to intercept, the electronic communications of Plaintiffs and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

229. Specifically, Defendant intercepted Plaintiffs' and Class Members' electronic communications via the Pixels, which tracked, stored, and unlawfully disclosed Plaintiffs' and Class Members' Private Information to third parties such as Google and Facebook.

230. Defendant's intercepted communications include, but are not limited to, communications to/from Plaintiffs and Class Members regarding their Sensitive Health Information, including information related to the Sleep Apnea Assessment.

231. By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiffs and Class Members to third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

232. By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiffs and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

233. Unauthorized Purpose. Defendant intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State—namely, invasion of privacy, among others.

234. The ECPA provides that a "party to the communication" may be liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C § 2511(2)(d).

235. Defendant is not a party to the communication, for purposes of the ECPA, based on its unauthorized duplication and transmission of communications with Plaintiffs and the Class. However, even assuming Defendant is a party, Defendant's simultaneous, unknown duplication, forwarding, and interception of Plaintiffs' and Class Members' Sensitive Health Information prevents Defendant from qualifying for the party exemption.

236. Defendant's acquisition of sensitive communications that were used and disclosed to Google was done for purposes of committing criminal and tortious acts in violation of the laws of the United States and individual States nationwide as set forth herein, including:

a. Invasion of privacy;

b. Breach of implied contract; and

c. Violations of HIPAA, 42 U.S.C. § 1320d-6(a)(3).

237. Defendant's conduct violated 42 U.S.C. § 1320d-6 in that it: Used and caused to be used cookie identifiers associated with specific users, including Plaintiffs and Class Members, without user authorization; and disclosed individually identifiable Sensitive Health Information to Google and Facebook without user authorization.

238. Defendant is not exempt from ECPA liability under 18 U.S.C. § 2511(2)(d) on the ground that it was a participant in Plaintiffs' and Class Members' communications about their Sensitive Health Information on its Website, because it used its participation in these communications to improperly share Plaintiffs' and Class Members' Private Information with third parties, including Google and Facebook, that did not participate in these communications, that Plaintiffs and Class

Members did not know were receiving their Sensitive Health Information, and that Plaintiffs and Class Members did not consent to receive their Sensitive Health Information.

239. As such, Defendant cannot viably claim any exception to ECPA liability.

240. Plaintiffs and Class Members have suffered damages as a direct and proximate result of Defendant's invasion of privacy in that:

a. Learning that Defendant has intruded upon, intercepted, transmitted, shared, and used their Sensitive Health Information for commercial purposes has caused Plaintiffs and Class Members to suffer emotional distress;

b. Defendant received substantial financial benefits from its use of Plaintiffs' and Class Members' Sensitive Health Information without providing any value or benefit to Plaintiffs or Class Members;

c. Defendant received substantial, quantifiable value from its use of Plaintiffs' and Class Members' Sensitive Health Information, such as understanding how people use its Website and determining what ads people see on its Website, without providing any value or benefit to Plaintiffs or Class Members;

d. The diminution in value of Plaintiffs' and Class Members' Sensitive Health Information and/or the loss of privacy due to Defendant making such Sensitive Health Information, which Plaintiffs and Class Members intended to remain private, no longer private.

241. Defendant intentionally used the wire or electronic communications to increase its profit margins. Defendant specifically used the Pixels to track and utilize Plaintiffs' and Class Members' Sensitive Health Information for financial gain.

242. Defendant was not acting under color of law to intercept Plaintiff's and the Class Members' wire or electronic communication.

243. Plaintiffs and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading their privacy via the Tracking Tools.

244. Any purported consent that Defendant may claim it received from Plaintiffs and Class Members was not valid.

245. In sending and acquiring the content of Plaintiffs' and Class Members' communications relating to the browsing of Defendant's Website, Defendant's purpose was tortious, criminal, and designed to violate federal and state legal provisions including a knowing intrusion into a private, place, conversation, or matter that would be highly offensive to a reasonable person.

246. As a result of Defendant's violation of the ECPA, Plaintiffs and Class Members are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorney's fees and costs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, pray for judgment against Defendant as follows:

A. an Order certifying the Nationwide Class, and Arkansas, Kansas, Pennsylvania, Florida, and Texas Subclasses, and appointing the Plaintiffs and their Counsel to represent the Classes;

B. equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Sensitive Health Information of Plaintiffs and Class Members;

C. injunctive relief requested by Plaintiffs, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members;

D. an award of all damages available at equity or law, including, but not limited to, actual, consequential, punitive, statutory and nominal damages, as allowed by law in an amount to be determined;

E. an award of attorney fees, costs, and litigation expenses, as allowed by law;

F. prejudgment interest on all amounts awarded; and

G. all such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs, on behalf of themselves and other members of the proposed Classes, hereby demand a jury trial on all issues so triable.

Dated: April 3, 2026

Respectfully submitted,

*/s/ Matthew J. Langley*
Matthew J. Langley (SBN 342286)
matt@almeidalawgroup.com
**ALMEIDA LAW GROUP LLC**
849 W. Webster Avenue
Chicago, Illinois 60614
t: 773-554-9354

Sonjay C. Singh*
**SIRI & GLIMSTAD LLP**
400 East Pratt Street
8th Floor - #16946751
Baltimore, MD 21202
Tel: (772) 783-8436
E: ssingh@sirillp.com

**pro hac vice forthcoming*

*Attorneys for Plaintiffs and the Class*